OPINION OF THE COURT
Matthew F. Cooper, J.
For close to three years, plaintiff Edie Weiner finally felt safe and secure in her country house. Nestled in the mountains of northeastern Pennsylvania and surrounded by tall woods, the house is in a private vacation community called the Hideout. The reason she felt safe, though, was not because the community is gated or has its own security force. Instead, it was because her ex-husband, defendant Jay Weiner, was barred by an order of protection from entering the Hideout and coming near her home.
Everything changed for plaintiff this past summer. That is when she learned that defendant had rented a house in the Hideout on the very same day that the order of protection expired. What scared her even more is that the house defendant rented is directly behind her house. A short walk through the woods would bring him to the edge of her back lawn where he could stand and stare into her home — under the cover of darkness or hidden by the trees — seeing what she is doing, what she is wearing, who she is with.
Plaintiff contends that her ex-husband, by moving into the Hideout as soon as the order of protection expired, is engaged in a campaign to intimidate and threaten her, and, in his own insidious way, Seeking once again to exert control over her life. Although she does not allege that he has tried to have any direct contact with her, she maintains that his mere presence within the gates of her community causes her fear and anxiety. As a result, plaintiff has moved for a new order of protection to again prevent defendant from entering the Hideout.
Plaintiff also seeks an order barring defendant from the Hideout based on the terms of a “no-molestation” clause contained in the stipulation that settled the parties’ divorce action. Because of what she believes to be his violation of the no-molestation clause, she asks to be relieved of her obligation under the stipulation to continue to pay her ex-husband spousal *1113 maintenance or to keep an insurance policy in effect for his benefit. Finally, she seeks an award of attorneys fees.
Defendant opposes plaintiffs motion in all respects. He takes the position that now that the order of protection has expired, it is his constitutional right to live anywhere he wishes, even if it is right behind his ex-wife’s home. He argues that inasmuch as he abided by the order of protection while it was in effect and has had no contact with plaintiff since that time, the court has no legal basis on which to issue a new order of protection. Finally, he maintains that the no-molestation clause in the stipulation of settlement cannot be construed as a bar to his having access to the Hideout or provide a means for plaintiff to cease complying with her support obligations to him.[1]
The major issue before the court is whether it has the power to issue a new order of protection where the ex-husband has had no contact with his ex-wife — and has made no effort to contact or communicate with her — but has simply rented a house in close proximity to her. The court must also decide whether defendant’s act of moving into the Hideout constitutes a breach of the stipulation’s no-molestation clause, and if so, whether such breach entitles plaintiff to the additional relief she seeks.
Facts and Procedural History
This is the second time since the parties’ divorce that plaintiff has had to return to court seeking post-judgment relief against her ex-husband with regard to her vacation home. The first was in 2007 when she obtained the order of protection that barred defendant from going to the Hideout. That order of protection expired on July 30, 2009.
The judgment of divorce, which was entered on July 17, 2001, incorporated by reference the terms and provisions of a stipulation of settlement that the parties signed on October 25, 2000. The stipulation contains a number of provisions that are relevant here. The first is a clause that often appears in matrimonial agreements and is generally referred to as either a “no-molestation” or a “non-molestation clause.” The clause, as it *1114 appears in article XII of the parties’ stipulation, reads in relevant part as follows:
“Neither party shall in any way molest, disturb or trouble the other, or interfere with the peace and comfort of the other, or compel or seek to compel the other to associate, cohabit or dwell with him or her by any action or proceeding for restoration of conjugal rights or by any coercive means whatsoever.”
The stipulation also provided that defendant would have all rights to the marital rent-stabilized apartment in Manhattan and plaintiff would have “exclusive and sole ownership” of the marital vacation residence in the Hideout. Despite giving up the rights to the rent-stabilized apartment and having received sole ownership of the Hideout house, plaintiff agreed to allow defendant the right to have periods of exclusive occupancy of the Hideout house until November 2013. Plaintiff, a small business owner, also agreed to pay defendant, a retired New York City teacher, $25,000 a year in maintenance, with payments to continue until the end of 2010, and to maintain a life insurance policy for his benefit.
As plaintiff would testify in this proceeding and in the earlier post-judgment proceeding that led to the issuance of the order of protection, she only agreed to pay support to defendant and allow him periods when he could stay in the Hideout house in return for obtaining the no-molestation clause. She stated that she was so anxious to end the marriage and have defendant out of her life that she was prepared to give him everything he wanted in the divorce just so long as she could be assured that he would “leave her alone” and never again interfere with her life.
As it turns out, defendant had no intention of letting his ex-wife live happily without him. Almost from the moment the divorce was granted, he began barraging her with telephone calls, letters and cards. All of these communications — bitter, mocking and nasty in tone — were to the effect that he would never let her go and that she would always be under his control. A prime example of this is a card he sent to her in which he wrote:
“I tried to stop loving you, by not calling you, not giving you the mail, and hopefully by not seeing you. All for nothing ... I haven’t lost my love for you in 3 years + 4 months of separation. However, *1115 at the same time, strangely, I have grown to hate you for what you have done to my life.”
In this same vein, defendant would send letters to his ex-wife addressed “Dear Bitch.” In one letter, he referred to her and their grown son as being “perfectly suited for each other — the bitch and the son-of-a-bitch.” In another letter, he again demonstrated his twisted obsession with her when he wrote:
“Lady Get Off My Back! You have been bitter, vicious, vengeful, vindictive and menopausal to me since Nov. 16, 1998. You feel uncomfortable about my leaving notes at your building. Too bad! As I told you, I will always love you — always. For some strange reason, I still want you. However I don’t need you any longer.”
Plaintiff felt defendant’s unwanted presence most acutely when it came to the house in the Hideout. Not content to simply enjoy his periods of exclusive occupancy, he would use those periods as a kind of Trojan horse to launch assaults at his ex-wife from within the confines of her own home. One of the most disturbing things he did was to completely violate her sense of privacy. When plaintiff requested that he not enter her bedroom during the times he had use of the house, defendant wrote her this chilling response:
“You told me on the phone and in your letter, there is no need for me to go into your bedroom. Your bedroom, like all the other rooms in the house, is part of the house. I have exclusive use of the house for 10 weeks a year through 2013.1 could, if I want, sleep in your bed, open the Venetian blinds, play with your underwear, but I don’t.”
After enduring this torment for a number of years, plaintiff decided she could take no more. Her breaking point came when defendant left a message on her home answering machine threatening to break the locked glass door leading to her bedroom in the house in the Hideout. She then made a motion to terminate his use of the Hideout and for an order of protection to keep him away from her and her home.
On October 3, 2006 the judge then presiding in the post-judgment matrimonial part issued an interim decision granting plaintiff a temporary order of protection that required defendant to stay away from plaintiff and from the Hideout. Subsequently, in a comprehensive and detailed decision rendered on July 18, 2007, the temporary order of protection then in effect *1116 was replaced with a two-year final order of protection. The final order commenced on July 30, 2007 and it expired on July 30, 2009.
The decision also granted plaintiff’s motion with regard to exclusive use of the Hideout home. Finding that defendant had violated the no-molestation provision of the parties’ divorce stipulation by subjecting plaintiff to “severe emotional and psychological distress,” the court terminated any right to use the house defendant had under the stipulation. Although plaintiffs request for counsel fees was granted, her application to be relieved of the obligation to pay maintenance or keep a life insurance policy in effect for defendant’s benefit was denied.
Defendant appealed. On November 13, 2008 the Appellate Division unanimously affirmed the trial court’s decision. It held that defendant, as a result of his “egregious behavior,” had “forfeited his right to the unusually generous and extraordinary condition allowing him to share living quarters with his former spouse.” (Werner v Weiner, 56 AD3d 293, 294 [1st Dept 2008].)
It appears that at all times while the order of protection was in effect, defendant complied with its terms. He did not set foot in the Hideout. He did not write, call or communicate in any way with plaintiff. He had no contact with her at all other than on one occasion when the parties inadvertently ran into each other on the street in Manhattan. In short, while the order of protection was in place, defendant let his ex-wife live in peace.
Regrettably, the peace was not permanent. No sooner had the order of protection expired then defendant set off to the Hideout to rent his own weekend house. Moreover, of all the houses that were available he chose one right behind plaintiff’s house, separated from it by only a narrow corridor of woods. Upon learning that she had this unwelcome new neighbor, plaintiff returned to court, this time on the instant motion seeking to have him once more barred from entering the Hideout.
In connection with the motion, this court conducted an evidentiary hearing at which both parties testified. Plaintiff testified that because of her ex-husband’s presence, she is afraid to go to the Hideout and has not been able to use her house. Defendant testified that not only does he intend to continue renting houses in the Hideout, but he intends to keep renting the one that is behind plaintiffs home.
*1117 Legal Analysis
The Application for an Order of Protection
Section 252 of the Domestic Relations Law authorizes the Supreme Court to issue an order of protection in either a prejudgment or post-judgment matrimonial proceeding. Such an order may require a party to stay away from the home, school, business or place of employment of the protected party, “and to stay away from any other specific location designated by the court.” (Domestic Relations Law § 252 [1] [a].)
Curiously, the standards for determining when an application for an order of protection should be granted in a Supreme Court matrimonial proceeding are found not in the Domestic Relations Law, but rather in section 812 of the Family Court Act. What is required, in effect, is that the party seeking the order of protection prove that the other party has committed one or more of the crimes that are listed under section 812 and are said to constitute a “family offense” within the meaning of the Family Court Act. (See Fakiris v Fakiris, 177 AD2d 540 [2d Dept 1991]; Roofeh v Roofeh, 138 Misc 2d 889 [Sup Ct, Nassau County 1988].) These crimes, which now total 19 in number, range from disorderly conduct, to sexual abuse, to stalking, to assault. The elements of each of the enumerated crimes are set forth in the Penal Law. Unlike in a criminal prosecution, where each element of the crime must be proved beyond a reasonable doubt, the party alleging the commission of a family offense for purposes of obtaining an order of protection need only prove the allegation by a fair preponderance of the evidence. (See Downing v Downing, 31 AD2d 913 [1st Dept 1969]; Matter of K.J. v K.K., 23 Misc 3d 754, 762 [Fam Ct, Orange County 2009].)
Defendant asserts that there is no possible way that his moving into the Hideout community — or even renting a house in direct proximity to his ex-wife’s — can constitute a family offense. In his opposition papers to the motion and in his post-hearing memorandum, he purports to analyze the elements of all the crimes listed under Family Court Act § 812 and demonstrate that none apply to his situation. The problem with his analysis is that he has restricted it to only the 10 crimes that were included under Family Court Act § 812 as of 1998.[2] Apparently, defendant has failed to recognize that in the more than a *1118 decade that has ensued the Legislature has seen fit to almost double the number of crimes that constitute a family offense and can give rise to an order of protection.
Any meaningful analysis as to whether defendant has committed a family offense upon which the issuance of an order of protection can be predicated must, of course, encompass the nine added crimes. These include the various degrees of stalking, and in particular stalking in the fourth degree. The crime of stalking in the fourth degree, which the Legislature created and included as a family offense in 1999, is defined under Penal Law § 120.45, in relevant part, as follows:
“A person is guilty of stalking in the fourth degree when he or she intentionally, and for no legitimate purpose, engages in a course of conduct directed at a specific person, and knows or reasonably should know that such conduct:
“1. is likely to cause reasonable fear of material harm to the physical health, safety or property of such person, a member of such person’s immediate family or a third party with whom such person is acquainted.”
Thus, in order to establish that defendant has committed the crime of stalking in the fourth degree, there are two things that must be proved. The first is that his presence in the Hideout is without legitimate purpose. The second is that he knows or should know that his presence there is likely to cause plaintiff fear for her physical health, safety or property.
Plaintiff testified credibly and compellingly at the hearing held in this matter as to her ex-husband’s purpose for being in the Hideout. When asked why she believes he rented a house there as soon as the order of protection expired, she responded, “I feel that he did it ultimately to be near me, to intimidate me.” She went on to describe defendant as a stalker who “refuses to stay away from me.”
The point was made that there are untold number of vacation communities similar to the Hideout in the Poconos and other rural areas surrounding New York City. Nevertheless, defendant has chosen to rent only in the Hideout — the community in which his ex-wife lives and where he had been prevented from entering because of his long pattern of “egregious” behavior towards her. According to plaintiff, it is clear that his act of moving to *1119 the Hideout — compounded by his renting the house directly behind hers — is just a continuation of that same abusive pattern and is absolutely devoid of any “legitimate purpose.”
In his testimony, defendant sought to explain why it was so important that he live in his ex-wife’s vacation community as opposed to any other place. His testimony, however, was neither credible nor compelling. In fact, with his extended diatribes on such matters as his volunteer work at a blood bank, his prowess as a long distance runner, and his displeasure over his adult son drinking beer, what he had to say was often bizarre. Perhaps the most peculiar aspect of his testimony was his attempt to tie the irresistible lure that the Hideout has for him to the fauna and flora of northeastern Pennsylvania. While defendant went on at great length about the joys of seeing deer and wild turkeys on the front lawn, as well as being able to witness the spectacle of the autumn colors, he seemed immune to the notion that deer and turkeys and trees with bright leaves abound just about everywhere in this part of the country.
The only time defendant even approached giving a credible reason for why he had to rent in the Hideout was when he said he knew people there and that this made the community familiar to him. Yet he gave no names and no information as to who these people may be or what type of contact, if any, he has had with them over the past few years. The distinct impression this left was that defendant has no real relationships with anyone in the community and that he returned to the Hideout because of the presence of one person and one person alone: his ex-wife.
Defendant’s explanation as to why he intends to continue renting the house behind plaintiff may have been even less convincing than his reasons for being in the Hideout in the first place. Although he explained in great detail how the house he rented has three bedrooms on three different floors, with a television set on each floor, he offered no reason why it would be so important for him to have so many bedrooms on so many floors, or, for that matter, so many televisions. The only reason he could articulate as to why he needed to be in this particular house was that after having been there just a few weekends he was “familiar with it,” and, as he put it, he “had broken it in.” Again, the clear impression this left was that this house offers only one great attraction to defendant: its proximity to his ex-wife.
Plaintiff also testified credibly and convincingly as to what might be called the fear factor. This is the second element of the *1120 crime of stalking in the fourth degree, which requires that the conduct at issue be such that it can reasonably be expected to cause fear for one’s health, safety and property. The fear on plaintiff’s part as she confronted her ex-husband in the courtroom was actually palpable. Asked if she was afraid of him, she responded as follows:
“Yes. He has in the past threatened me, my son, my boyfriend, my property ... He instigates things. He is a stalker. He just likes to bully people. He is extremely threatening of everyone and I can just — I can never predict what he is going to do. He is capable of almost anything because he is really not all there.”
When viewed in the context of defendant’s past actions— which were described in the decision of July 18, 2007, as a “campaign to taunt, humiliate, menace, and otherwise torment plaintiff’ — plaintiff has every reason to continue to fear for her health, safety and property. This fear is in no way lessened by the fact that at least to this point there has been no direct contact or communication. Defendant’s presence alone in the Hideout is more than enough to make plaintiff feel the way she does.
The crime of stalking in the fourth degree does not require that the offender actually intend to cause harm, or even the fear of harm, to the victim. All that is required is “that the offender know or reasonably know that his conduct is likely to cause reasonable fear of material harm to the victim’s physical health, safety or property.” (People v Stuart, 100 NY2d 412, 427 [2003]; see also People v Wong, 3 Misc 3d 274 [Crim Ct, NY County 2004].) Here, it is inconceivable that defendant could be unaware of the effect his presence in the Hideout would have on plaintiff. In fact, every indication is that his insistence on returning there was largely fueled by the knowledge that it would have such effect.
Plaintiff has proved by a fair preponderance of the credible evidence both of the elements of stalking in the fourth degree. She has established that defendant, by deliberately moving in close proximity to her vacation home the moment the order of protection expired and continuing to rent there, has engaged in a course of conduct for no legitimate purpose — “meaning] the absence of a reason or justification to engage someone, other than to hound, frighten, intimidate or threaten.” (People v Stuart, 100 NY2d at 428.) She has also demonstrated that defend *1121 ant has done this with the knowledge that he has caused her and continues to cause her the type of fear required under Penal Law § 120.45. Accordingly, the court finds that defendant Jay Weiner has committed the family offense of stalking in the fourth degree.
In making this finding, I am aware that there are no reported cases where a violation of Penal Law § 120.45 has been predicated largely on the offender moving into a specific area or community. I am also aware that the parties live relatively close to each other in Manhattan. Finally, I am aware that the acts that have taken place in years past — as did the bulk of defendant’s overtly threatening behavior towards plaintiff — ordinarily should not serve as the basis for the issuance of an order of protection. (See Swersky v Swersky, 299 AD2d 540 [2d Dept 2002].) Nevertheless, under the circumstances presented here— where the ex-husband has literally positioned himself on the edge of his ex-wife’s back lawn in a wooded and relatively sparsely populated rural area, and where his lack of contact with her appears to be more of a hiatus occasioned by the imposition of the prior order of protection and the pendency of this motion — there is no question that defendant’s move into the Hideout represents only the latest chapter in an extended and ongoing effort to inflict suffering on plaintiff for her having fled the marriage. Such conduct cannot be allowed to continue.
Stalking, which is an unreasonable and unacceptable attempt to exert control over someone, takes many shapes and forms. In enacting the “Clinic Access and Anti-Stalking Act of 1999,” which created the crime codified under Penal Law § 120.45, the Legislature recognized that the “unfortunate reality is that stalking victims have been intolerably forced to live in fear of their stalkers” and that “[s]talkers who repeatedly follow, phone, write, confront, threaten or otherwise unacceptably intrude upon their victims, often inflict immeasurable emotional and physical harm upon them.” (L 1999, ch 635, § 2, cited in People v Stuart, 100 NY2d at 416, 417 [emphasis added].) Defendant is in every sense of the word a stalker who has “unacceptably intruded” on his victim. As such, he continues to pose a real and ongoing danger to plaintiffs safety and well-being. Accordingly, the court will grant her application for a final order of protection that will require him to not only stay away from her but to stay away from the Hideout.
Unlike Family Court Act § 842, the provision governing the issuance of orders of protection in the Family Court, Domestic *1122 Relations Law § 252 does not provide for a maximum term for an order issued in the Supreme Court. Considering that the conduct at issue here commenced as soon as the last order of protection ended, it serves no purpose to grant plaintiff a new order that has a duration of only a few years. In order to allow plaintiff to live her life in peace, both in the city and the country, and not have to return to court yet again in the near future, the order of protection that the court is granting her will have a term of 20 years. This means that it will expire on April 5, 2030. By then defendant will be 85 years old and, one would hope, no longer pose a threat to his ex-wife.
The Application for an Order Enforcing the No-Molestation Provision
Plaintiff also seeks protection from defendant by way of an order specifically directing him not to enter the Hideout and to refrain from renting or otherwise occupying a house there. She bases this application on the no-molestation provision contained in the divorce settlement.
The Appellate Division, in affirming the July 2007 decision, addressed the no-molestation clause in connection with the provision of the stipulation of settlement that allowed defendant periods of exclusive occupancy of plaintiffs home in the Hideout. Citing Borax v Borax (4 NY2d 113 [1958]), and Cygielman v Cygielman (111 AD2d 1057 [3d Dept 1985]), it noted that a no-molestation clause is generally viewed as an independent clause in a divorce agreement and that its breach does not relieve the non-breaching ex-spouse of his or her obligation to perform under the agreement. Despite this, the Court, taking into consideration the “particular circumstances of this case,” held that “defendant’s egregious behavior operated to impose a forfeiture of defendant’s rights under the parties’ settlement stipulation.” (Weiner v Weiner, 56 AD3d at 294.)
The relief sought in this instance — to bar defendant from having any access to the Hideout community — does not involve the issue of independent versus interdependent clauses. Inasmuch as it has already been determined that defendant has forfeited his right to periods of exclusive occupancy of the Hideout house, there is no provision left extant in the stipulation of settlement that gives defendant any specific right to live in the Hideout. The no-molestation provision, however, remains an integral part of the agreement, and it clearly states that “neither party shall in any way molest, disturb or trouble the other, or interfere with the peace and comfort of the other.”
*1123 If nothing else, defendant’s presence in the Hideout and his unacceptable intrusion into his ex-wife’s life has “disturbed” and “troubled” plaintiff, and it has interfered with her “peace and comfort.” Thus, defendant’s actions with regard to the Hideout constitute a clear breach of the no-molestation clause. Although the order of protection that the court is granting plaintiff eliminates much of the need for the relief sought pursuant to the no-molestation clause, plaintiff is still entitled to an order directing defendant to cure his breach. Accordingly, an order will be entered enforcing the no-molestation clause by directing defendant not to enter the Hideout and to cease renting or otherwise occupying any house or other residence therein.
The Application to Suspend Maintenance
As discussed above, a breach of a no-molestation clause normally does not absolve the non-breaching spouse of performing his or her own obligations under the agreement. Consequently, courts have generally held that a violation of the clause cannot serve to suspend an obligation to pay maintenance. (See Cygielman v Cygielman, 111 AD2d 1057 [1985]; Shedler v Shedler, 32 Mise 2d 290 [Sup Ct, Westchester County 1961].) It has been held, however, in at least one case, Reybold v Reybold (45 AD2d 263 [4th Dept 1974]), that a violation of the clause can be the basis for the suspension of payments where the covenant against molestation is found to be essential to the agreement and interdependent with the covenant to pay maintenance. As with Reybold v Reybold, this case may very well present a situation where the no-molestation provision is both essential to the agreement and inextricably linked to the maintenance provision. It is clear that the no-molestation clause here was intended to be an essential term of the stipulation of settlement. Plaintiff’s uncontradicted testimony, both at this hearing and the earlier hearing, was that she insisted on a no-molestation provision being in the agreement and that in order to obtain it she had to agree to pay defendant maintenance and keep an insurance policy in effect for his benefit. The interdependence of the two provisions is firmly established by the fact that defendant received the financial provisions that he wanted as a quid pro quo for his agreeing to the no-molestation provision that plaintiff wanted. Under these circumstances, defendant should not be able to breach his commitment not to molest, disturb, or interfere with plaintiffs peace and comfort and still expect plaintiff to honor her commitment to pay him support and maintain life insurance for him.
*1124 Requiring plaintiff to continue to make maintenance payments to defendant makes even less sense when one considers that those payments contribute to defendant’s financial ability to rent the house in the Hideout. The perverse and illogical result is that, in essence, plaintiff is being made to fund defendant’s campaign of terror against her. Clearly, there is something wrong with plaintiff having to give money to defendant so that he can then turn around and use that money to cause her fear and suffering.
This court, however, is not in the position of being able to relieve plaintiff of her obligation under the agreement to provide defendant with financial benefits. The decision of July 18, 2007 held that plaintiff was required to bring a plenary action to set aside the stipulation of settlement in order to seek termination of her financial obligations to defendant on the basis of the defendant’s breach of the no-molestation provision. Because plaintiff has not brought a plenary action, the doctrine of the law of the case (see Hass & Gottlieb v Sook Hi Lee, 11 AD3d 230, 231-232 [1st Dept 2004]) prevents this court from deciding that portion of her application in the context of this motion.
Plaintiff also submits that her obligation to pay maintenance, which extends under the terms of the stipulation only until the end of this year, should be eliminated or lowered due to her financial situation. Although plaintiff produced evidence indicating that her income from her business has declined significantly, she failed to demonstrate the overall degree of extreme financial hardship required to modify a stipulated maintenance provision that is incorporated but not merged into the judgment of divorce. (See Luftig v Luftig, 239 AD2d 225 [1st Dept 1997].) On this basis too, her application must be denied without prejudice.
The Application for Counsel Fees
Plaintiff is entitled to reasonable and necessary counsel fees both in connection with her obtaining the final order of protection (see Domestic Relations Law § 252 [1] [f]), and with her obtaining relief sought with regard to the defendant’s breach of the no-molestation clause (see Domestic Relations Law § 238). A hearing to set the amount of those fees will be held on a date to be scheduled.
Conclusion
There are two remaining issues raised by defendant that need to be briefly addressed. The first is defendant’s insistence that *1125 he has a constitutional right to live where he chooses and travel where he wishes. Although infringing on anybody’s rights in this regard is a serious matter and not to be taken lightly, it must be recognized that such rights, constitutional or other, are in no way absolute. They certainly do not extend to being used as a license to inflict fear of harm on another. (See e.g. People v Wong, 3 Misc 3d 274 [2004].)
The second issue is defendant’s claim that while he may have acted inappropriately toward plaintiff in the past, he does not have the propensity to act that way now. Having heard defendant’s testimony and having witnessed his demeanor, the court concludes that there is little reason to believe that defendant has changed in any way. This conclusion has only been reinforced by two letter submissions that were received from plaintiffs counsel. These submissions, which were on notice to defendant’s counsel, concerned a series of calls defendant made and a letter he sent subsequent to the hearing.
The calls in question were made to plaintiffs brother in January 2010. In those calls, which the brother was clear he did not wish to receive, defendant repeatedly asked about plaintiffs health, insisting that when he saw her in court she looked “terrible.” The letter in question was sent to plaintiffs counsel by defendant and received on February 16, 2010. In that letter, defendant seems to be comparing his situation for some unfathomable reason to that of Nelson Mandela and the 2009 New York Jets football team. Both the calls and the letter only serve to further the notion that defendant remains every bit as intent as ever in seeking to inject himself into his ex-wife’s life. They also eliminate any doubts whatsoever as to the necessity of having granted plaintiff the protective relief that she sought, both as to scope and duration.
In light of the foregoing, plaintiffs motion is granted to the extent of: (1) issuing plaintiff a full and final order of protection in her favor as against defendant that commences immediately and will remain in force until April 5, 2030, and that requires defendant to stay away from plaintiff and the community called the Hideout; (2) ordering defendant to comply with the terms of the no-molestation provision of the parties’ stipulation of settlement by immediately refraining from entering the Hideout and from renting or otherwise occupying a house or any other residence therein; and (3) directing the parties to appear on a date to be scheduled for a hearing on the amount of counsel fees that *1126 are to be awarded to plaintiff. All other relief sought by either plaintiff or defendant is denied.

. Defendant cross-moved for two things: to have me recuse myself on the grounds that I was biased against him and had prejudged the case, and to order plaintiff to pay $6,250 in maintenance payments that she had withheld. The cross motion for recusal was denied on the record prior to the commencement of the evidentiary hearing. The balance of the cross motion was withdrawn when plaintiff paid the maintenance to defendant.

. The crimes discussed by defendant are disorderly conduct, harassment in the first degree, harassment in the second degree, aggravated harassment in the second degree, menacing in the second degree, menacing in the third degree, reckless endangerment, assault in the second degree, assault in the *1118 third degree, and attempted assault. Defendant is correct that none of these are applicable to the facts presented here.